**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

```
------------------------------------------------------------- x
UNITED STATES OF AMERICA,            :
                                     :    NO.: 3:13-mc-00116 (RNC)(DFM)
                    Petitioner,      :
                                     :
    vs.                              :
                                     :
CLAYTON HOLDINGS, LLC,               :
                                     :
                    Respondent.      :
------------------------------------------------------------- X
```

### RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM THIRD-PARTY WITNESS CLAYTON HOLDINGS LLC

Third-party witness Clayton Holdings LLC ("Clayton") opposes the Petition for Summary Enforcement of Administrative Subpoena (the "Petition") served by the Government, and states:

### PRELIMINARY STATEMENT

The Government, through its Order to Show Cause, seeks to have this Court order the imaging of a third-party witness's entire computer network (totaling approximately 32 terabytes of data) so that it can seize "any and all documents," including "all communications" related to the services Clayton provided to all of its 193 clients for a 3-year period. At issue is the permissible scope for the breadth of an administrative subpoena for electronically-stored information ("ESI"), and whether the government is entitled as a matter of law to seize the Respondent's computer system to effectuate compliance with its subpoena.

The Government argues that "for nearly six weeks" it has attempted to "resolve this matter through negotiations with Clayton." (Gov. Pet. at ¶10.) Unfortunately, the "negotiation" from the Government has consisted solely of setting a date for Clayton to provide the

Government with access to its offices in order to image all of the computer servers, and then giving Clayton 48 hours to accede to its demand before moving to compel. Absent from the "negotiation" was the Government's willingness to negotiate the scope of its requests, despite repeated requests from Clayton.

The Government's motion sets forth only the most cursory of discussions regarding: (1) the relevance of its requests to its investigations, (2) how the particular requests relate to those investigations, and, most importantly, (3) the scope of its requests. Similarly absent from its argument that Clayton has "flout[ed] the subpoena and delay[ed] providing critical documents," is any mention of the 6-plus years of cooperation with the members of the RMBS Working Group arising from residential mortgage-backed securities ("RMBS Investigations"). Reading the Government's papers, the court could be left with the mistaken belief that the subpoena at issue is the Government's first and only interaction with Clayton regarding the production of documents, e-mails and other information.

The Subpoena was issued on behalf of the RMBS Working Group.[1] As the court may be aware, the RMBS Working Group is comprised of state and federal agencies, including among others the Department of Justice and various U.S. Attorney's Offices (collectively the "DOJ"), the Securities and Exchange Commission and its Regional Offices (collectively the "SEC"), the Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"), and multiple state Attorneys General. The Government in its moving papers stated that "[a]lthough Clayton has previously provided some materials to components of the Justice Department, Clayton's productions have been incomplete and piecemeal, causing unnecessary

---

[1] Attached as Ex. 1 is a copy of the serving e-mail, as well as the cover letter accompanying the Subpoena from Geoffrey Graber, Director of the RMBS Working Group. The cover letter and Subpoena are dated July 1, but as is reflected in the e-mail, it wasn't served until the evening of July 2.

delays to the government's investigation." (Gov. Pet. at ¶11.) The government did not provide

any specificity with regard to this paragraph, but for the court's convenience, a brief summary of

the past 6 years of Clayton's cooperation and productions to the DOJ and the members of the

Working Group, both prior to and following the formalization of the RMBS Working Group is

set forth below:

| RMBS WORKING GROUP PRODUCTIONS 2007-2013 | |
|---|---|
| **Agencies** | U.S. Department of Justice Civil Division |
| | U.S. Department of Justice Consumer Litigation |
| | U.S. Attorney's Office for the Central District of California |
| | U.S. Attorney's Office for the District of Colorado |
| | U.S. Attorney's Office for the District of Massachusetts |
| | U.S. Attorney's Office for the District of New Jersey |
| | U.S. Attorney's Office for the District of Omaha |
| | U.S. Attorney's Office for the Northern District of California |
| | U.S. Attorney's Office for the Southern District of Florida |
| | U.S. Attorney's Office for the Northern District of Georgia |
| | U.S. Attorney's Office for the Southern District of New York |
| | U.S. Attorney's Office for the Western District of Pennsylvania |
| | Securities and Exchange Commission Division of Enforcement |
| | Securities and Exchange Commission Atlanta Regional Office |
| | Securities and Exchange Commission Boston Regional Office |
| | Securities and Exchange Commission Los Angeles Regional Office |
| | Securities and Exchange Commission Miami Regional Office |
| | Securities and Exchange Commission New York Regional Office |
| | Securities and Exchange Commission San Francisco Regional Office |
| | Special Inspector General for the Troubled Asset Relief Program |
| | California Attorney General's Office |
| | Connecticut Attorney General's Office |
| | Massachusetts Attorney General's Office |
| | Nevada Attorney General's Office |
| | New York Attorney General's Office |
| | Ohio Attorney General's Office |
| **Size of Productions** | Over 100 GB |
| **Pages of E-mails** | Over 3 million |
| **Witnesses** | Formal Testimony |
| | Grand Jury Testimony |
| | Informal Interviews |
| | Telephone Conferences |
| **Motions to Compel** | 0 |

The Subpoena is just the latest in over six years of subpoenas, investigatory demands, and formal and informal requests for information that Clayton has received and responded to as a responsible corporate entity. In short, Clayton has acted more than reasonably, more than responsibly to aid the members of the RMBS Working Group in their respective investigations. Clayton's assistance has involved more than the production of documents and communications. It has also included, at Clayton's substantial expense, making its outside counsel and employees repeatedly available to educate an ever-growing, and often-changing, number government attorneys and investigators regarding Clayton's business and due diligence services, including how to read and understand reports and terminology. Far from a company that has flouted the government, Clayton at great fiscal expense, disruption of its business, harm to its reputation from a public that does not always understand its limited required role as a third-party witness, has responded to this and every government request for over 6 years.

Why then has Clayton not agreed to the Government's demands with respect to its latest subpoena? The Subpoena and the means by which the government seeks to seize the requested ESI is unreasonable, especially for a company that has been more than reasonable and accommodating to the members of the RMBS Working Group. Indeed, several members of the RMBS Working Group have expressed to Clayton their disagreement with the Subpoena, the Motion to Compel, and their preference to continue to seek documents through their own subpoenas and to continue the on-going working relationship with Clayton. Notably, since the issuance of the Subpoena and the filing of the Order to Show Cause, Clayton has continued to receive document requests from, and to produce documents, to members of the RMBS Working Group.

The Government's Petition also fails to discuss the details of the scope of the Subpoena requests and only briefly mentions two of the eight enumerated requests in the Subpoena: due diligence reports (covered by Request 2-"[a]ll data from any database you used, maintained, or accessed concerning your provision of due diligence services on mortgage loans and mortgage loan pools") and e-mails (covered by Request 3-"[a]ll communications, including e-mails, instant messages, or Bloomberg messages, concerning your provision of due diligence services on mortgage loans and mortgage loan pools.")

For the Court's convenience, the scope of those two requests and the Government's demand to image Clayton's entire servers can be summarized as follows:

| SCOPE OF SUBPOENA | | |
|---|---|---|
| **Request** | **Number** | **Data Size** |
| Time Frame | 3 Years | |
| All Clients | 193 | |
| Image Network | 3 Offices (CT, CO & FL) | Approx. 32 Terabytes |
| Due Diligence Projects[2] | 9,856 | Approx. 1.2 Terabytes Approx. 10 million files |
| E-mails Custodians | 4,820 | Approx. 3 Terabytes |
| Compliance Date | 13 days (including July 4 holiday period) | |

The Subpoena, both on its face and through discussions with the Government, amounts to a prohibited "fishing expedition" in an effort to collect and warehouse massive amounts of data. The Government has acknowledged to Clayton that it is not investigating all of Clayton's 193 clients. Far from that number, in the weeks prior to issuing its Subpoena, the Government

---

[2] The Subpoena does not define "due diligence services." For the purposes of this litigation, Clayton has interpreted this term to mean its provision of credit, compliance and data integrity reviews. There are other aspects to Clayton's business and given the government's sweeping view of "relevance" and the Subpoena's all encompassing definition of "concerning," the Subpoena as written could call for the production of documents and communications from its other business lines and therefore entail and even greater burden.

informed Clayton that it was investigating 16 financial institutions.[3] Of the 16 entities, 1 was not a client and for another, Clayton performed 1 minimal project review of 250 loans in May 2005. Rather, than seek documents for those clients who are actually the subjects of its investigation, the Government is seeking to seize every document and communication for all 193 clients and for almost 5,000 e-mail custodians, in violation of Clayton's rights under the Fourth Amendment.

## RELEVANT FACTUAL HISTORY

Given the Government's claim that Clayton has "flouted" its attempts to resolve this matter through negotiation and refused to comply, a brief overview of the history between Clayton and the Government with regard to the Subpoena, as well as Clayton's role as a due diligence provider is necessary.[4]

### A. History of the Subpoena and "Negotiations"

As summarized above, Clayton has been responding to formal and informal requests from members of the RMBS Working Group for more than 6 years. In early June 2013, Marc Rothenberg, Clayton's outside counsel, spoke with Matthew Stegman, Assistant Director of the RMBS Working Group, following multiple recent subpoenas having been issued by various members of the RMBS Working Group, to discuss reducing the financial cost on Clayton imposed by the DOJ's technical requirements for ESI productions. Given the volume of due diligence reports and that most of the documents had previously been produced to members of the RMBS Working Group in their native format pursuant to agreements in each of those matters, Clayton requested a global agreement with the RMBS Working Group wherein any

---

[3] The names of those entities has not to Clayton's knowledge been publicly disclosed, and, as such, Clayton has not identified them in its Opposition.

[4] Should the Court request information regarding any or all of the past 6 years of production to the RMBS Working Group members, Clayton can provide such information during the September 24 hearing.

requested due diligence reports would be produced natively. Mr. Stegman agreed to consider Clayton's proposal. The parties further discussed how helpful prior meetings and telephone conferences had been between Clayton's outside counsel and individual RMBS Working Group attorneys and staff. During these meetings, Mr. Rothenberg explained and answered questions about its business and services, including the customized process of a due diligence reviews for each client, communications with its clients and loan pool sellers, the customized reports Clayton issued and how to understand those reports and the terminologies, the history of prior investigations, and the documents readily available from prior productions. The parties discussed whether it would be possible to set up a conference call with a larger number of RMBS Working Group attorneys rather than continue to conduct them individually and/or by Office.

On July 2, 2013, Mr. Rothenberg received a telephone call from John Vagelatos, an AUSA form the Eastern District of New York. AUSA Vagelatos stated that he was part of the RMBS Working Group, was working with Mr. Stegman, that the RMBS Working Group was going to be issuing a global subpoena covering all investigations rather than continue to serve subpoenas for each investigation, and inquired as to whether Mr. Rothenberg would accept service via e-mail. Mr. Rothenberg informed AUSA Vagelatos he would accept service via e-mail and that once he received and reviewed the subpoena, they would discuss it following the July 4 holiday. AUSA Vagelatos made no mention of the Government's intention to seek all documents and communications for all clients for a 3-year period, much less the Government's desire to image Clayton's servers. At least one member of the RMBS Working Group has utilized a similar global subpoena with Clayton to cover its investigations over the past 5 years. For each new investigation, that agency has sought narrow document requests under the umbrella of the global subpoena and the two parties have maintained a professional working relationship.

AUSA Vagelatos e-mailed the Subpoena and cover letter at 7:02 p.m. on July 2, the evening before the extended July 4 holiday. Both the Subpoena and cover letter are dated July 1.

Clayton has subsequently learned that the RMBS Working Group also issued identical subpoenas and cover letters dated July 1 to at least two other third-parties, LPS Credit Risk Solutions d/b/a Watterson Prime ("Watterson Prime") and LPS Valuation Solutions ("LPS Valuation"). (A copy of the Watterson Prime and LPS Valuation subpoenas and cover letters are attached hereto as Ex. 2). Interestingly, the LPS Valuation subpoena seeks the production of documents and communications for its "due diligence services," despite the fact that LPS Valuation is an appraisal company, and not a due diligence provider. The July 1 Watterson Prime subpoena was served on July 11 and the July 1 LPS Valuation subpoena was served on July 19. Watterson Prime and LPS Valuation have not allowed the Government to image their servers nor have they produced diligence reports or e-mails, yet as of the date of this memorandum, the Government has not filed a motion to compel or even threatened to do so in order to enforce either subpoena. The Government's inaction belies its contention that Clayton's "delay" is hindering the Government's ability to get "crucial" documents.

On July 12, 2013, AUSA Vagelatos and Mr. Rothenberg set up a telephone conference to discuss the Subpoena for July 17. Due to scheduling conflicts by both parties, the call did not occur until July 19. On July 19, AUSA Vagelatos and Mr. Stegman discussed Clayton's objections to the breadth of the subpoena, and the burden caused by such subpoena. Specifically, Clayton objected to producing documents and communications for work performed for clients that were not under investigation, producing documents that were already in possession of the RMBS Working Group, duplicating documents that had been or were currently being produced pursuant to RMBS Working Group subpoenas to the 16 financial institutions under investigation,

and having the Government image Clayton's servers. Clayton offered to work with the RMBS Working Group to fill in the holes in any productions from the financial institutions and to provide lists of due diligence reports previously produced to the RMBS Working Group. Clayton further reiterated its willingness to produce e-mails, as it had done previously, for its primary points of contact between Clayton and the clients under investigation.

The Government agreed that it would discuss internally Clayton's requests to reduce the scope of the Subpoena. Following the discussion of the Subpoena, AUSA Vagelatos and Mr. Rothenberg discussed the particular financial investigation AUSA Vagelatos was handling, a private party civil-RMBS case involving that same client, a case of which the Government was not aware, and producing a spreadsheet of projects Clayton had performed for that client. Later that afternoon, Mr. Rothenberg e-mailed AUSA Vagelatos and Mr. Stegman the spreadsheet and the subpoena from that civil case.

The next time Clayton heard from the Government was more than two weeks later, on August 5, when AUSA Edward Newman e-mailed Mr. Rothenberg to inform him that he was taking over for AUSA Vagelatos and requested a telephone call for the next day. The parties spoke on August 7, with the conversation beginning with the Government stating that if Clayton was not prepared to fully comply with the Subpoena by that Friday, August 9, the Government would move to compel. Surprised by the Government's position and tone, once again Clayton attempted to engage in a productive conversation regarding narrowing the scope of the Subpoena, which was rebuffed by the Government. The Government admitted, as it had on July 19, that all of Clayton's clients were not under investigation, but that it wanted to maintain a repository all of the documents should it have a future need for them. The Government also reiterated Clayton's status as a third-party witness. The parties agreed that Clayton would

consult internally to determine its own technical capabilities to produce 3 years of due diligence reports and whether Clayton would agree to the production of documents beyond the clients under investigation. Clayton requested additional time to get these answers and the Government agreed to extend the time until August 14. During the interim period, AUSA Newman and Mr. Rothenberg continued to speak, including providing AUSA Newman a tutorial on Clayton's business and the process of a due diligence review in an effort to have him better understand the types of documents Clayton has on its systems and the likely usefulness of those documents. AUSA Newman candidly acknowledged that he had only a general understanding of Clayton and had not reviewed any of its due diligence reports.

On August 14, Clayton informed AUSA Newman that despite its objection to the overly broad scope of the subpoena, in an effort to reach a reasonable accommodation on the Subpoena, Clayton was prepared to entertain production of the due diligence reports for all of its clients; however, given that most of these clients have never been the subject of a government investigation, that the due diligence reports are the confidential property of its clients pursuant to contract, and that many of those contracts contain provisions requiring Clayton to notify their clients of a subpoena for production of their respective due diligence reports, Clayton had to provide clients with notice and the opportunity to object. Additionally, as some of those clients were either not current clients or no longer in business, Clayton would need to pull those contracts and find the appropriate contact person(s). Clayton further informed the Government that with respect to the clients under investigation, Clayton had established protocols in place with those clients to produce their due diligence reports so that notice would not be an issue. Clayton told the Government that it could accomplish the research, notice and copying of the due diligence reports in a two-week period. The Government's response was that two weeks was too

long and that it wanted to send in their technical team to mirror the servers immediately. The Government provided no rational basis, and still has not, for any exigent circumstance warranting its need to seize Clayton's records.

Clayton further stated that it could not agree to a similar wholesale production regarding e-mails as the number of custodian files to be reviewed and the size of those files rendered the cost of reviewing those e-mails for privilege and relevance prohibitively expensive. Given the thousands of e-mail custodians and the tens of millions of documents contained therein, the cost would be unbearable to Clayton and would have to be undertaken regardless of a claw back provision. Lastly, Clayton offered to continue to discuss narrowing the scope of e-mail production to identify key individuals as it had done with many members of the RMBS Working Group, but yet again, Clayton's offer was rejected outright.

Clayton did not hear back from the Government again until nine days later, on Friday, August 23 at 5:08 p.m., when AUSA Newman called to inform Clayton that the Government would be filling a motion to compel early the next week, and asking whether Clayton wanted to have the motion filed in the District Court of Connecticut or the Eastern District of New York.

### B. Clayton's Role as a Due Diligence Provider

Clayton is a Shelton, Connecticut-based private company, who among its other business products in 2005 through 2007, provided loan review and due diligence services to its clients. Due diligence was not an independent re-frontline underwriting of loans against originator guidelines; rather, due diligence was the extraction of client-specified data points from a sample of loans chosen by its clients, the subsequent comparison of that data to client-specified tolerances, and the reporting of that comparison to the client in customized reports. Because of the customized nature of each review for each client, reviews cannot be compared from one

client to another, and within a particular client, each review varied based upon the loan products, originator guidelines and client tolerances.

Moreover, Clayton was not paid based on the grades it assigned and Clayton did not provide an opinion as to whether a loan is good or bad, should be purchased or securitized or whether an originator had complied with its own guidelines. Lastly, Clayton did not opine on the future performance of a loan.

During its due diligence reviews, Clayton contractors inputted the data they extracted from loan files into CLAS (Clayton Loan Analysis System), an internally-developed and now defunct database used by Clayton for its due diligence services. CLAS contains Clayton's intellectual property regarding its exception methodology and includes a full compliance engine, which analyzed federal, state and local compliance laws. CLAS is not a multi-tier system, with a standardized rules engine that would automatically apply across multiple transactions. Instead, each due diligence review commenced on a custom generated version of CLAS with hard-coded business rules, generated from a library of scripts. Accordingly, there is no central comprehensive database of the approximately 10,000 projects Clayton performed between 2005 and 2007. Clayton does not maintain records denoting which scripts and rules were utilized on CLAS for each of the reviews.

Beginning in 2007, Clayton began work on the next generation of CLAS, known as eCLAS. Over the next few years, Clayton expended significant time and financial resources to the development of eCLAS, which culminated in its broad adoption by Clayton in early 2010. eCLAS is not compatible with CLAS. In particular, CLAS data cannot be opened or read in eCLAS. Even though CLAS has been replaced with eCLAS, Clayton believes that the intellectual property contained within CLAS is more advanced than that used by its competitors.

Importantly, all of the data that Clayton's clients hired it to extract was provided to its clients in the due diligence reports generated from CLAS. Those reports have been, and continue to be, maintained by Clayton.

## ARGUMENT

## I.    THE GOVERNMENT'S MOTION TO COMPEL SHOULD BE DENIED BECAUSE THE SUBPOENA REQUESTS ARE UNREASONABLE IN VIOLATION OF THE FOURTH AMENDMENT

The Government's position on its right to boundless discovery is predicated on the Attorney General's authority to determine relevance under FIRREA. However, a FIRREA subpoena, as with any administrative subpoena, does not entitle the Government to limitless discovery from a third-party, nor does it obviate the requirements of the Fourth Amendment.

In acting on the Government's Petition for Enforcement of its administrative subpoena, the court's role is "not that of a mere rubber stamp, but as an independent reviewing authority called upon to insure the integrity of the proceeding." Wearly, W.L. v. Federal Trade Commission, 616 F.2d 662, 665 (3rd Cir. 1980); United States v. Security State Bank and Trust, 473 F.2d 638, 642 (5th Cir. 1973). It is well settled that the Fourth Amendment requires an administrative agency subpoena be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." See v. City of Seattle, 387 U.S. 541, 544 (1967). A subpoena that is "far too sweeping" or not "suitably specific and properly limited in scope" violates the Fourth Amendment, and, as such, must be quashed. United States v. R. Enterprises, Inc., 498 U.S. 292, 299 (1991); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209 (1946)(subpoenas shall not be "excessive[] for the purposes of the relevant inquiry. . ."). Moreover, the documents sought cannot already be in the

- 13 -

possession of the government. <u>United States v. Powell</u>, 379 U.S. 47, 57-58 (1964); <u>RNR Enters, Inc. v. SEC</u>, 122 F.3d 93, 96 (2d Cir. 1997).

Clayton has not and does not challenge the Government's authority to issue its Subpoena under FIRREA. Rather, the Subpoena requests on their face and as applied to Clayton are in contravention of the requirements long-ago established by the Supreme Court for a proper administrative subpoena: they are not sufficiently limited in its scope, sufficiently particular, are unduly burdensome in their application, and many call for documents already in the Government's possession.

The Government's response to date, both in its "negotiations" with Clayton and in its Petition, has been that issues of scope, particularity and burden are resolved by the Government's mirroring of all of Clayton's servers. However, an unreasonable subpoena cannot be justified by subjecting the subpoena recipient to an even greater intrusion on their Fourth Amendment rights. Indeed, by proposing a wholesale mirroring of Clayton's servers as a remedy for the burden of the Subpoena, the Government is admitting that its Subpoena is unreasonable. If the Government's solution is endorsed by this Court, it would mean the end to the long-ago established Supreme Court requirements for drafting and issuing subpoenas and the beginning of a new protocol: a subpoena is reasonable as long as the government determines that it is and is prepared to use its resources to enter the recipient's premises and copy the recipient's computers. Longstanding principles of constraining governmental power though the judicial supervision of subpoenas would be reduced to courts having the ministerial role of confirming that the government has statutory authority to issue its subpoena. Such a result was never intended by Congress, by prior judicial precedent, and should not be condoned by this Court.

As a threshold matter, the Government's Petition, despite only briefly discussing two categories of documents, due diligence reports and e-mails, seeks enforcement of the entire Subpoena. As such, Clayton will address each of the 8 document requests as set forth in the Subpoena, but for the Court's convenience, we have addressed the due diligence and e-mail requests first.

> Request 2. All data from any database you used, maintained, or accessed concerning your provision of due diligence services on mortgage loans and mortgage loan pools.

Request No. 2 seeks due diligence reports documents pertaining to <u>all of Clayton's 193 clients for a 3-year period</u>. Rather than issue a subpoena tailored to the entities actually under investigation, and more particularly to the projects for those entities, the Subpoena seeks every due diligence related document for every Clayton client for 3 years. Clayton does not challenge either the Government's authority to seek, or the relevance of, due diligence reports for any of its clients who are actually under investigation for possible civil violations of FIRREA. Indeed, Clayton has routinely produced, and continues to presently produce, thousands of such reports to members of the RMBS Working Group. However, this request is in direct contravention of the standards long ago established by the Supreme Court for reasonableness under the Fourth Amendment as it is not sufficiently limited in scope, far too sweeping, lacks relevancy in purpose, and is unduly burdensome.

Request No. 2's deficiencies include, but are not limited to:

- Requires production of reports for 193 clients, almost all of whom are <u>not</u> under investigation;

- Requires production for a 3-year period;

- Not tied to the investigation of any particular mortgage-backed securitization(s);

- 15 -

- Not tied to the investigation of any particular loan(s) included within any particular mortgage-back securitization(s); and

- Not tied to any particular project(s).

The scope of Request No. 2 is without bounds. The number of clients covered by this request is "limited" solely by the number of clients with whom Clayton happened to have conducted business from 2005 thought 2007, rather than by the Government specifically enumerating the financial institutions it is investigating. Perhaps most indicative of the Government's lack of concern regarding scope has been its opposition to narrowing the scope to the 16 financial institutions it previously identified to Clayton. In response to Clayton's repeated requests, the Government has taken the position, "we just want it all."

If the particular clients are of no consequence, then how can the documents concerning the work for those clients possibly be relevant to the ongoing investigations? Certainly, for these documents to be relevant to an investigation "into the assembly, underwriting and issuance of residential mortgage-back securities," they must be tied to particular securities, issued by particular financial institutions. Yet, the Government identifies no such information and ties no definition of "mortgage loans" or "mortgage loan pools" to any securitization. In fact, the Subpoena provides no definition for these terms.

Such information is readily available to the Government from the financial institutions under investigation, who can identify, as many have done in the context of other RMBS litigations, whether a loan or loan pool included within a securitization was previously reviewed by Clayton or other third-parties. Presumably after years of investigation, involving financial institutions and third-parties producing untold millions of pages documents and communications,

as well as countless interviews and formal testimony, the Government should be able to issue a subpoena suitably specific and properly limited in scope.

The requirement that subpoena requests be particularized, was settled over 100 years ago by the Supreme Court in Hale v. Henkel, 201 U.S. 43, 77 (1906) (government's request for all contracts and correspondence between the subpoena target and six different companies violated the "general principal of law with regard to the particularity required in the description of documents necessary to a search warrant or subpoena. A general subpoena of this description is equally indefensible as a search warrant would be if couched in similar terms.") The potential for the government to overreach is even more problematic in the context of ESI. Subpoenas seeking such non-particularized data such as entire storage devices or overly broad categories of documents have repeatedly been found to violate the Fourth Amendment. See e.g., In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993, 846 F. Supp 11, 12-13 (S.D.N.Y 1994) (a subpoena must seek categories of documents, not categories of filing cabinets or electronic storage devices); In re Grand Jury Proceedings Witnesses Bardier and Wheeler, 486 F. Supp. 1203, 1214 (D. Nev. 1980) (government's subpoena seeking "all of not specifically enumerated above which reflect or are related to the financial activities of those (fourteen) individuals or entities listed" was overbroad.)

Similar sweeping requests by the Government have been found unreasonable. For example, in United States v. Theodore, 479 F.2d 749 (4th Cir. 1973), the IRS issued an extremely far-reaching administrative summons deemed "unprecedented in its breadth" by the Fourth Circuit. The summons requested an accountant produce all of the tax returns and all of the work records relating to all of his clients for a three-year period. In particular the summons requested:

>> (1) All accounting records, workpapers, correspondence, memoranda and
>> other documents in your possession or used by you in connection with the
>> preparation of all Federal Income Tax returns for your customers and
>> clients for the years 1969, 1970, and 1971.
>>
>> (2) All retained copies of 1969, 1970 and 1971 Federal Income Tax
>> returns, the originals of which were prepared by you for your customers
>> and clients.

Id. at 751. The Government sought to defend the summons as part of a "nationwide project to

investigate individual professional tax preparers to determine whether they were filing accurate

returns for their clients." Id. at 752 (emphasis added). Under this nationwide effort to

investigate and bring cases against one source of tax cheating, the IRS' Intelligence Division,

posed as ordinary customers and went to the offices of selected tax preparers, provided them

with the information needed to prepare a return, then audited those returns to determine if the

preparer had used accurately the information furnished. Id. If the IRS determined that the

information had been used improperly, but there was insufficient evidence of wrongdoing to

bring a criminal prosecution, the case was transferred to the IRS Audit Division, who then issued

administrative summonses under 26 U.S.C. § 7602. Section 7602 provides:

>> Examination of books and witnesses. For the purpose of ascertaining the
>> correctness of any return, making a return where none has been made,
>> determining the liability of any person for any internal revenue tax or the
>> liability at law or in equity of any transferee or fiduciary of any person in
>> respect of any internal revenue tax, or collecting any such liability, the
>> Secretary or his delegate is authorized-(1) To examine any books, papers,
>> records, or other data which may be relevant or material to such
>> inquiry;(2) To summon the person liable for tax or required to perform the
>> act, or any officer or employee of such person, or any person having
>> possession, custody, or care of books of account containing entries relating
>> to the business of the person liable for tax or required to perform the act,
>> or any other person the Secretary or his delegate may deem proper, to
>> appear before the Secretary or his delegate at a time and place named in
>> the summons and to produce such books, papers, records, or other data,
>> and to give such testimony, under oath, as may be relevant or material to
>> such inquiry; and(3) To take such testimony of the person concerned,
>> under oath, as may be relevant or material to such inquiry.

The Fourth Circuit struck down the administrative summons as unreasonable and too broad stating:

> A summons will be deemed unreasonable and unenforceable if it is overbroad and disproportionate to the end sought. . .The Government cannot go on a "fishing expedition" through the appellant's records, . . .and where it appears that the purpose of the summons is a "rambling exploration" of a third party's files, it will not be enforced.

Id. at 754.

Just as the Government argued in Theodore, here the Government has argued that the scope of its Subpoena is proper because the Attorney General has deemed them relevant to its "broad and ongoing nationwide investigation" into RMBS. (Gov't. Pet. at ¶7.) However, nationwide investigations are not excluded from the Constitution.

The Government has not substantiated its need for the documents requested. The Government has not articulated any basis to believe Clayton's 196 clients have committed any violation of FIRREA, much less any other law. Nor has the Government articulated how the records for the clients not under investigation are relevant to the financial institutions actually under investigation. Lastly, the Government has not explained why Clayton's offer to produce the due diligence reports for the clients under investigation, subject, of course, to the Government's ability at a future date to seek reports on additional clients should those clients become the actual subject of a future investigation, is unreasonable. For over 6 years, Clayton has continued to produce follow-up documents under original subpoenas without objection. The Government cannot argue that it is foreclosed from coming back for additional information, nor can they argue that there is an exigency created by concerns over spoliation or destruction. Clayton has maintained its due diligence reports (and e-mails) since 2007 and continues to

pursuant to subpoenas and agreements with both RMBS Working Group members, as well as the large number of private party civil-RMBS litigation subpoenas it receives.

Lastly, to the extent the Government has subpoenaed and received due diligence reports from the financial institutions under investigation, as well as in prior Clayton productions, it is unreasonable to seek the very same documents.

> ### Request No. 3. All communications, including e-mails, instant messages, or Bloomberg messages, concerning your provision of due diligence services on mortgage loans and mortgage loan pools.

Even more unreasonable is Request No. 3's demand that Clayton produce <u>all communications</u> concerning <u>all clients</u> from <u>all custodians</u> for a <u>3-year period</u>. As detailed previously, this request calls for the production of e-mails from <u>4,620</u> accounts, covering approximately <u>3 terabytes of data</u>. As the Court may be aware, a terabyte equals 1,000 gigabytes. While the exact number of documents and pages cannot be ascertained for each terabyte, independent e-discovery vendors publish ESI tables and calculators to help understand the approximate translation of terabytes to documents and pages. Attached as Ex. 3, is one such calculator from Hudson Legal. According to their table, each terabyte contains approximately 7.5 million documents and 75 million printed pages. Thus, the Government's request for over 3 terabytes of e-mails could entail the review of over 22.5 million documents or 225 million pages. Assuming a person could review 50 documents an hour, a review for privilege and relevance would require 450,000 hours, i.e. more than 200 man-years. Such a review would entail a prohibitive cost in money, personnel and time for a third-party witness. As written, and as the Government is now trying to enforce, this request is unreasonable.

The Government in refusing to negotiate e-mail review and production to a reasonable scope has argued that a 'claw back" agreement is the panacea to the myriad of Fourth

Amendment problems inherent in this request. Simply stated, the Government is wrong. The fundamental flaw in the Government's position is that even with such an agreement, Clayton will still have to incur an inordinate, and certainly unreasonable, fiscal expense and disruption to its business in order to review each of the tens of millions of pages of e-mails to determine if they are privileged or are unresponsive as they contain matters of a personal nature or unrelated to the provision of due diligence services to its clients. The Government had no response in its "negotiations" with Clayton regarding this issue nor did it address it in its Petition.

The deficiencies applicable to Request No. 2 are incorporated herein and apply with equal or greater magnitude to the e-mail production, which is even broader in scope, less relevant in purpose and carries a far greater burden. Indeed, concerns over constitutionally prohibited "fishing expeditions" are Haightened in any productions as e-mails, by their very nature, are a repository for personal communications and thoughts, news, sports and entertainment alerts, retail solicitations and purchases, etc., none of which are relevant to nor should the Government be in possession of as part of a FIRREA investigation.

Senior U.S. District Court Judge Haight recently spoke on this issue in <u>Tucker v. AIG, Inc.</u>, 281 F.R.D. 85 (D. Conn. 2012). Although the <u>Tucker</u> case applied to a civil discovery subpoena, Judge Haight's ruling provided some guiding precepts as to the reasonableness of e-mail demands and the costs in complying with those demands is on point. In <u>Tucker</u>, the plaintiff sought to compel a subpoena seeking, among other things, the imaging of 83 laptops to seek e-mails from a third-party "well beyond the parameters" of e-mails to and from one particular person regarding narrow claims. <u>Id.</u> at 93. Judge Haight fairly categorized this type of third-party discovery demand as seeking to "<u>dredge an ocean of [the non-party's ESI] in an effort to capture a few elusive, perhaps non-existent, fish</u>." <u>Id.</u> at 95. (emphasis added.) Judge Haight

also recognized the immense burden on a third-party, both in terms of the cost of having retained counsel review ESI prior to production and the business disruption of diverting internal legal and technical resources to participate in and supervise discovery of questionable relevance. Id. at 97. See also, Thompson v. Jiffy Lube Int'l Inc., 2006 WL 1174040 at *3 (D. Kan. May 1, 2006) ("On its face, a request for the production of all corporate and employee e-mail . . . is overly broad . . . "the mere suspicion that a document containing relevant evidence might be located in defendant's computer files does not justify the production of all email communications or company records.")

The Government's Subpoena is similarly unreasonable as it is seeking to engage in an even more expansive and harmful dredging expedition.

Lastly, to the extent the Government has subpoenaed and received e-mails from the financial institutions under investigation, as well as in prior Clayton productions, it is unreasonable to seek the very same documents.

> ### Request No. 1. Any database you used, maintained, or accessed concerning your provision of due diligence services on mortgage loans and mortgage loan pools

Request No. 1 seeks Clayton's decommissioned proprietary CLAS database. The RMBS Working Group was previously aware of this fact, as well as the April 2, 2013 decision of New York State Justice Ramos denying a civil RMBS plaintiff's attempt to compel Clayton to bring CLAS back to life in Ambac Assurance Corp. v. EMC Mortgage, Index No. 650421/2011, (Sup. Ct. N.Y. Co., Apr. 2, 2013). In addition, Clayton raised Justice Ramos's decision during the August 14 telephone conference with AUSA Newman. Justice Ramos, in denying Ambac's motion, held that this request was "a bridge too far" and in response to MBIA's argument that the CLAS database contained critical information, stated "No, it's not. No, it's not. To call it

critical information is nonsense." (Attached as Exhibit 4 is the relevant portion of the transcript from the April 2, 2013 hearing; Dkt. 13-1 at 35:5-16)

Perhaps in acknowledgment of the misplaced nature of this request, the Government has set forth no basis for the Court to consider it. Moreover, during Clayton's telephone conference with the Government regarding this request, the Government could not articulate what information relevant to its investigations exists in CLAS that isn't contained within the due diligence reports that were provided to Clayton's clients. It was during that call that AUSA Newman admitted that he hadn't even reviewed any Clayton due diligence reports, despite the Government being in possession of thousands of reports previously produced by Clayton and the financial institutions who have been separately subpoenaed by the RMBS Working Group.

Further, it would be a herculean task to even try to bring back useable CLAS data. For example, the CLAS system custom generated for each deal contains several hundred database tables, each of which would need to be retrieved. In addition, field names used in the CLAS database are generally cryptic and their meanings are not self-evident. There is no known data dictionary for the field names, and Clayton relied on the knowledge of IT personnel who worked with the system on a daily basis, all of whom left Clayton's employ long ago. None of the current IT personnel have any experience with CLAS. Indeed, Clayton has only one current employee, a Mortgage Data Analyst, who has some working knowledge of CLAS. However, if this employee was unavailable to perform his regular job functions for an extended period, it would substantially disrupt Clayton's ability to service its clients and imperil its ability to meet contractual obligations. Given these and the other impediments, it has been impossible for Clayton to even calculate the time and financial resources required to attempt this massive undertaking. Needless to say, the costs would be unbearable.

Lastly, the CLAS database is a proprietary system and its production would potentially subject it to being produced under the various Freedom of Information/Sunshine laws governing the state members of the RMBS Working group. Such a disclosure would subject Clayton to a competitive disadvantage. (Attached as Exhibit 5 is a copy of the affidavit filed by Clayton's General Counsel, Robert A. Harris, in the Ambac case further detailing, among other things, CLAS and Clayton's role as a due diligence provider.)

Given these conditions, and considering that CLAS does not contain information not otherwise available to the Government, Request No. 1 is unreasonable, not relevant, and unduly burdensome.

> Request No. 4. Documents sufficient to identify all engagements, assignments, or projects concerning your provision of due diligence services on mortgage loans and mortgage loan pools, and the loan originator, the number of loans, and the time period during which you performed the due diligence services. In lieu of producing responsive documents, you may provide a spreadsheet (i.e., in Microsoft Excel) of all such engagements, assignments, or projects, including the loan originator, the number of loans, and the time period during which you performed the due diligence services.

Request No. 4 calls for the production of a list of all Clayton projects from 2005 to 2007. This information has previously been produced to multiple members of the RMBS Working Group, and, as such this request is unreasonable. Remarkably, during none of the "negotiations" with the Government has the Government sought production of this information. Despite the unreasonable nature of this request, Clayton would, of course, make another copy for the Government.

> Request No. 5. All invoices for the engagements, assignments, and projects identified in response to request No. 4 above.

Request No. 5's demand for invoice information is unreasonable. As a practical matter, and as Clayton previously explained to the Government, Clayton has not maintained its invoicing

systems from the 2005 to 2007 time period; therefore, it cannot go into its systems and retrieve the requested information. As a matter of law, this request is subject to the same deficiencies as Requests No. 2 and 3, which are incorporated herein. Lastly, this information, to the extent the Court deems it relevant, would be available from, and may have already been produced by, the financial institutions under investigation.

> Request No. 6. All agreements and contracts between you and any other person concerning your provision of due diligence services on mortgage loans and mortgage loan pools.

Request No.6's demand for contracts is subject to the same deficiencies as Requests 2 and 3. Additionally, Clayton has previously produced to multiple members of the RMBS Working Group the contracts and agreements with respect to 13 of financial institutions under investigation. Clayton would, of course, produce the contracts for the two remaining clients under investigation and make a copy of the prior production. The Government has never raised this request in its discussions with Clayton.

> Request No. 7. Documents sufficient to identify the names, last known addresses and telephone numbers for your employees and contractors who performed, managed and provide due diligence services on mortgage loans and mortgage loan pools. In lieu of producing responsive documents, you may provide a spreadsheet (i.e., in Microsoft Excel) of the names, last known addresses and telephone numbers for your employees and contractors who performed, managed and provided due diligence services on mortgage loans and mortgage loan pools.

Request No. 7 calls for the production of the private information of the thousands of employees and contractors who worked for Clayton from 2005 through 2007 and, as such is unreasonable to the extent that is seeks the private information of thousands of individuals, many of whom have longer affiliated with Clayton.

> Request No. 8. All documents concerning your training, instructions, directions or guidance provided by you, or any other person, to your employees and contractors concerning performing due diligence services on mortgage loans and mortgage loan pools.

Request No. 8 calls for Clayton's internal training materials. Such information has previously been produced to multiple members of the RMBS Working Group, and as such, is unreasonable. Clayton would, of course, make another copy of it for the Government. As with Requests No. 4, 6 & 7, the Government has never raised them during our discussions.

## II. IN ORDER TO EFFECTUATE COMPLIANCE THE GOVERNMENT HAS CREATED AN ADMINISTRATIVE SEARCH SUBJECT TO A PROBABLE CAUSE DETERMINATION

The Government concedes in its Petition that in order to effectuate compliance, its Information Technology personnel would enter Clayton's premises to "prepar[e] a duplicate or 'mirrored' image of Clayton's servers. . . (Gov. Pet. at ¶12.) First, this directive was not issued to "assist Clayton in responding to the subpoena," as the Government has argued. (Id.) Rather, it was Government's intention from the outset: issue as broad a subpoena as possible so that compliance can only be accomplished by the Government's intrusion into a private company's premises and seizing the images of its server contents.

From the first discussions through its moving papers, the Government has sought to mirror Clayton's servers. This has been the Government's approach not only with Clayton, but also with Watterson Prime and LPS Valuation. Moreover, the Court need look no further than the Government's statement that it "anticipates that retrieving the required information can be completed within a matter of hours." (Id.) Given that the Government has no information regarding Clayton's network, its size, systems, etc. to base an estimate on retrieving the

documents requested in the Subpoena, the only basis for Government's representation is their intent to image the entirety of the servers.

Similarly probative of the Government's intent, was the Government's reaction to the two-week period which Clayton needed to produce the due diligence reports without Government intrusion. The Government acted as if the country was facing an imminent attack to national security if the documents weren't produced immediately. The time frame was certainly reasonable and proportionate to the size of the request; the Government's response was not. Additionally, as discussed previously, the Government's inaction with regard to the Watterson Prime and LPS Valuation subpoenas further belies the Government's claim of exigency.

When "an on-premises search and inspection" is needed to execute an administrative subpoena, then a valid search warrant and showing of probable cause is required. United States v. Phibbs, 999 F.2d. 1053, 1077 (6th Cir. 1993), cert. denied, 510 U.S. 1119 (1994). Given that the Government demands the entirety of Clayton's servers and that it wants its technology personnel to image those servers, the Government has transformed its administrative subpoena into an administrative search, subject to the requirements of a search warrant. The Government's scarce basis for the issuance of its subpoena certainly cannot give rise to the higher probable cause requirement for a warrant.

## CONCLUSION

For the foregoing reasons, Respondent Clayton Holdings LLC respectfully requests that

the Government's Petition For Summary Enforcement of Administrative Subpoena be denied.

Dated:  September 24, 2013

By: ___/s/ Marc Rothenberg___ _____
Marc Rothenberg*
**Blank Rome LLP**
The Chrysler Building
405 Lexington Avenue
New York, New York  10174
T:  (212) 885-5121
E:  Rothenberg@blankrome.com


*and*


By:___/s/ Robert A. Harris___ _____
Robert A. Harris (Bar No.: ct06759)
General Counsel
**Clayton Holdings LLC**
100 Beard Sawmill Road
Shelton, Connecticut  06484
T:  (203) 926-8158
E:  rharris@clayton.com

*Counsel for Clayton Holdings LLC*
*\*Pro Hac Vice Applications Pending*